NATIONAL LABOR RELATIONS BOARD
v. DUNCAN FOUNDRY & MACHINE
WORKS, Inc.

No. 8521.

Circuit Court of Appeals, Seventh Circuit.

May 16, 1944.

Stephen M. Reynolds, of Minneapolis, Minn., and Alvin J. Rockwell, Gen. Counsel, Malcolm F. Halliday, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Jacob I. Karro and Isadore Greenberg, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Henry I. Green, of Urbana, Ill., Karl K. Hoagland, of Alton, Ill., and James E. Garstang, of St. Louis, Mo., for respondent.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

The National Labor Relations Board requests enforcement, under Section 10(e) of the Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., of its order requiring respondent to (a) cease and desist from unfair labor practices, (b) post appropriate notices, (c) withdraw recognition from and completely disestablish the "Association" as the bargaining representatives of its employees, (d) cease giving effect to its agreement with the Association, (e) offer reinstatement with back pay to two employees, and (f) make whole eleven others for loss of pay they may have suffered by reason of respondent's discrimination against them. The order is based upon findings that respondent has violated Section 8 (1), (2), and (3) of the Act by dominating and supporting the Employees' Representation Plan of the Duncan Foundry & Machine Works, Inc., and a later organization, the Employees' Association of the Duncan Foundry & Machine Works, Inc., by discriminating against thirteen of its employees because of their union affiliations and activities, and by interfering with the self-organization of its employees. Respondent challenges the substantial sufficiency of the evidence to support the findings (1) that it has illegally supported and dominated the Employees' Representation Plan (hereafter referred to as the E. R. P.) and the Employees' Association (hereafter referred to as the Association), and (2) that it has illegally discriminated against Seward Kershner and Charles Cairns.

Respondent manufactures and distributes machines and castings, largely in interstate commerce. The number of its employees has fluctuated from some one hundred in 1934, to over four hundred in 1943. Due to a devastating fire which destroyed much of respondent's property in 1937, the number dropped to less than forty in the years 1937 and 1939. E. R. P. had come in to being early in January, 1934, by action of a majority of the employees. They requested respondent's cooperation in formation of their organization and its plan to provide a basis for relationship between management and workmen. The employees elected representatives, the balloting taking place in the plant during working hours, under facilities provided by respondent. A plan was submitted to which the employer never formally assented, although both parties proceeded to function as if formal agreement had been accomplished. From time to time Juttemeyer, the

596

personnel manager of respondent, met with representatives of the employees in friendly, amicable meetings.

The respondent's relationship with E. R. P. and the question of whether the latter was dominated by respondent is material on the crucial question of whether, at the time the complaint was filed, respondent was improperly dominating the chronologically later association, only to the extent that continuity of identity is shown to have existed between the two associations and to the extent that it is established that improper practices toward E. R. P. were carried over from the first and persisted in the later union. In view of our conclusion with respect to the later association, it is unnecessary to comment at length upon this earlier phase of the findings and order, for we think it clear from the undisputed evidence that E. R. P. died a natural death, brought about by desertion by all interested parties, terminating in eternal rigor mortis.

The trial examiner found, and the Board agreed, that respondent "assisted and encouraged the instigation and formation of the Association as successor to and alter ego of the E. R. P. and thereafter dominated and interfered with the administration and encouraged and fostered the growth and continued existence of the Association * * *". Apparently the Board's reasoning is that there was no evidence to show that respondent had effectually disestablished E. R. P. and that, consequently, what was deemed improper in its career, carried over and persisted in the new association.

█ Disestablishment of a bargaining unit previously dominated by the employer is well nigh essential in order to afford employees an opportunity to start anew in organizing an uninfluenced bargaining unit, since otherwise the influence of management may not be eliminated and the employees rendered entirely free to act upon their own initiative. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219. The test is well expressed in National Labor Relations Board v. Rath Packing Co., 8 Cir., 123 F.2d 684, 685 (modified on denial of rehearing 130 F. 2d 540): "To avoid having a new labor organization regarded as the alter ego or the successor of an old labor organization that was subject to employer domination, it must appear that, prior to the formation of the new organization, the employees were advised by their employer, in substance, that all recognition of the old organization by him had ended, and that they were entirely free to join or not to join any other labor organization, and that the employer was completely indifferent as to what organization they joined."

█ We think the Board's evidence justifies only the finding that, in the hearing here, the test was fully met. True, respondent did not circularize each member of the E. R. P. with notice of cessation of support of the E. R. P. However, we can not, nor can the Board, after seven years, say that it was necessary for respondent to follow any certain formal mechanical pattern of procedure in order to evince disestablishment, inasmuch as the evidence establishes beyond peradventure an honest, active and successful effort by respondent to effectuate its detachment, and clear understanding of the attitude of the employer in this regard upon the part of the employees.

During May, 1937, Juttemeyer, at a meeting of the representatives of E. R. P. told them that the company could no longer be a party to or recognize the existing organization; that E. R. P. by virtue of the Supreme Court's decision, was "outlawed," and that they would have to do "something else," "whatever they wanted to do"; that it was up to them to decide what they wished to do. When some of the employees asked for advice as to what steps were advisable in forming a proper organization under the Act, Juttemeyer replied, according to the testimony offered by the Board, that he could give them no advice and that "From now on, you are on your own. It is just whatever you want to do." From this, wholly without basis in fact, the Board inferred that respondent suggested that the men form an independent union. This was wholly unjustified.

Furthermore the inference is completely and fully negatived by the undisputed subsequent events and the actions of the employees. After Juttemeyer's remarks, the men retired and perfected plans to hold a preliminary meeting of employees to discuss the matter further, and invited "anyone who could attend to be present." They passed the word around among the employees and several of them attended, as well as two representatives of a union in existence at the refinery of the Standard

Oil Company, who had been invited to make suggestions and supply information concerning the creation of an employees' association. The conferees decided to call a mass meeting of all employees at the Odd Fellow's Hall, and, in preparation for the meeting, drafted a proposed agreement, patterned largely upon the contract in force at the Standard Oil plant.

The document was presented to the mass meeting on June 4, which had been announced on the factory bulletin board and was attended by approximately 119 persons out of some 200 employees. One Cannon explained that the company had advised that it could no longer cooperate with the old organization; that the employees would have to do something else; that it was up to them. In his own words, he "dumped the matter into their laps." Extended discussion followed, covering the questions of joining a national union, forming an independent local and dues. They decided to form their own organization. A motion that the officers of the earlier union be retained was defeated. The draft of a proposed agreement which had been submitted was rejected, because the men felt, as they said, that they had had no hand in its composition. The president of the old organization was placed in nomination and, by majority vote, he was defeated and Schmidt, a new man, elected.

The Board had no substantial factual basis to support a finding that the Association had been assisted, encouraged or dominated by respondent. The undisputed acts of respondents and of the employees justify only one conclusion: that the company intended to abandon and succeeded in relinquishing all ties with E. R. P.; that the employees understood that they were not bound by respondent's preference, if one existed, of which there is no evidence, in the matter of the formation of a new union; that the employees intended to and did sever all connection with the earlier organization; and that the Association was an entirely separate entity from the prior organization brought about by free, untrammeled, uninfluenced vote of the men.

■ The theory of Congress, as evinced by the Act, is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace. Thus Congress provides for collective-bargaining, a term descriptive of a course of conduct or process calculated to insure freedom of negotiations and to facilitate arrival at equitable understandings concerning labor matters and employer and employee relationships. As a means contributing to achievement of such untrammeled collective-bargaining, indeed, as an essential step in realization of this prescribed purpose, Congress provides as one of the duties of the employer that he shall desist from dominating, influencing or interfering with the collective organization of his employees. This, obviously, is with the thought that the employees in determining their action, shall have a free choice. Consequently any employer well advised as to the law will immediately disclose to his employees his impartiality, his neutrality and his resolution to prevent injection of the slightest managerial influence into the employees' collective organization. N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L. R. 1352; Globe Cotton Mills v. N. L. R. B., 5 Cir., 103 F.2d 91; N. L. R. B. v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540; N. L. R. B. v. Jahn & Ollier Engraving Co., 7 Cir., 123 F.2d 589, at page 593; Valley Mould & Iron Corp. v. N. L. R. B., 7 Cir., 116 F.2d 760 at page 764, certiorari denied 313 U.S. 590, 61 S.Ct. 1114, 85 L.Ed. 1545; N. L. R. B. v. Aluminum Products Co., 7 Cir., 120 F.2d 567, at page 571; Singer Mfg. Co. v. N. L. R. B., 7 Cir., 119 F.2d 131, at page 134, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549. The undisputed facts here disclose realization of just such standard of conduct upon the employer's part,—an earnest, honest attempt to comply with the purpose and intent of the Act. The employer, feeling that its actions in the past in its dealings with employees, though representing years of peace and serenity and disclosing a fraternal friendly attitude on the part of employer for the employee, might be beyond the absolute neutrality contemplated by the Act, promptly advised its employees that it could no longer maintain the past relationship; that it was divorcing itself from their organization and that it could not give any advice or suggestions, but that their matter of self-organization was their own responsibility to be handled by them as they saw fit, without suggestions from the employer. Questioning in no way the wisdom of the congressional policy, the employer's words and acts demonstrated its conscientious compliance therewith. No other finding, no other conclusion, is possible from the evidence the Board itself presented.

We think further that the conclusion of the Board that "When viewed in connection with the agreement, which was evidently still under consideration in some form, the Association's by-laws, except for such modifications as were voted at the mass meeting on June 4, constituted substantially a continuation of the purposes, structure, and procedure of the E. R. P." is without support by substantial evidence. We have found that E. R. P. was effectively disestablished. Thus the company can neither be credited nor blamed because a majority of the employees of their own initiative elected to organize an independent union rather than one affiliated with a national organization or because many of the regulations and provisions of the constitution were similar to those of E. R. P. If freedom of uninfluenced action contemplated on the part of employees under the Wagner Act is to have meaning, we must recognize their right freely to select the plan of operation under which they desire to act.

The Board considered significant the fact that George Horstman, the representative of the pattern shop, was permitted to continue his employment during the period following the fire, when many of the employees were laid off, and that he received a $100 Christmas bonus. From this it infers that Horstman was more a representative of management than of the union. From this, the Board indulges the further inference of company-domination because Horstman was the individual most active in keeping the Association alive from 1937 to 1939. We believe this piling of inference upon · inference a chimerical method of logic, resulting in a non-sequitor, for there is no evidence that Horstman was an agent of the management in E. R. P., or that he carried any loyalty to the employer into the Association. Furthermore, the testimony reveals that the Association's president, Schmidt, was laid off for several months after the fire, demonstrating clearly that respondent was not endeavoring to retain officers of the Association on the payroll to the exclusion of other employees.

The trial examiner emphasized that "Juttemeyer expounded the respondent's position on membership requirements" at the meeting on June 24, 1937, and found significant the Association's plan to have Juttemeyer present once a month at meetings, a proposal never carried out. The evidence is that Juttemeyer, at their request advised the men as to the classes of employees eligible for membership in any union under the Act, and explained that persons occupying supervisory capacities could not be admitted. This is no reflection of "respondent's position on membership requirements." On the contrary it might well have been to respondent's benefit to have included representatives of management in the membership. Juttemeyer's statements were clearly only his understanding of what the law required under the existing facts. Furthermore Juttemeyer's attendance at an informal meeting came about at the direct invitation of the men, and not at Juttemeyer's or respondent's solicitation. We think that these acts plainly demonstrate intelligent working relations between, and the bargaining activities of, the parties, rather than company-domination. Surely the Act does not require that there be no mutual understanding and trust between employer and employee, or that lack of harmonious relations between the two groups constitutes the only possible proof of absence of company-domination.

The Board, finding Charles Cairns had been discharged on June 16 because of his union affiliations, directed respondent to reinstate him. Respondent denies existence of substantial evidence to support the finding and the consequent order.

Advised that Cairns believed he had a hernia, respondent sent him to a clinic for examination. This clinic was an independent contractor performing certain medical work for respondent. Following his examination, unattended and uninfluenced by respondent, the employee on June 2, 1942 was directed to return to work. However, he did not appear or communicate with respondent until June 16, whereupon he was advised that his employment had been terminated some days previously because of his failure to report. The evidence is undisputed, indeed, it is stipulated, that on June 12, respondent filed with state authorities notice of termination of employment required under the state law; reporting on that date that Cairns "was to report for work on June 2 but never came in" and that his job, therefore, had been "declared vacant."

The record is devoid of evidence that respondent had any notice of Cairns' affiliation with "United" prior to June 16, and the evidence is undisputed that no union buttons were given out or worn by

 

the members prior to June 14, two days after respondent had filed notice of termination of employment with the state authorities and two days before knowledge was brought to the respondent of Cairns' affiliation with "United." Under these circumstances no trace of evidence appears justifying a finding that respondent refused to accept Cairns for re-employment because of his association with the union. No such motive could have existed, in view of the undisputed fact that on June 12, his employment had been terminated for failure to report for work on June 2, all prior to the time when respondent learned of his union affiliation.

The Board directed also that respondent reinstate Seward Kershner who had been employed intermittently by respondent over a period of some years. The Board found that on June 22, 1942, he resigned, but not because respondent had transferred him to less desirable work, as he asserted. It found further, however, that respondent thereafter conditioned rehiring Kershner upon his renunciation of the union. Kershner applied for re-employment in August and, at his request, was granted an interview with the president and counsel for respondent. The conference was at some length and, during its course, the employee made certain statements which the attorney attempted to embrace in a written statement then prepared in which it was recited that Kershner did not believe that the company had discriminated against him because he joined the union; that he had signed the union card without thinking about it and that he was "rushed into it and did not wish to belong to it." The evidence was conflicting as to whether the document expressed correctly the oral statements of Kershner. He insisted that it did not and respondent claimed that it did. At any rate, he did not sign and testified that at the time the statement was handed to him, he inquired as to when respondent wished it returned and that counsel for respondent replied "the sooner you get it back, the sooner you can go back to work." This he repeated on cross-examination, saying that he understood the words to mean that if he did not file a formal written statement containing the essence of what was in that prepared in the office, he would not get his job back. All this was disputed by respondent. In view of the controverted character of the evidence,

we think we are not justified in saying that the Board had before it no substantial evidence to support its finding with respect to Kershner. The Board, accepting the latter's testimony, concluded that respondent made a condition precedent to his re-employment that he sign a statement in effect repudiating "United." Our jurisdiction does not include the power of determination of the correctness of this finding or to say as a matter of law that the Board was unjustified in making it.

The order of the Board is modified as follows: Paragraph (1) is eliminated except subparagraph (d). In paragraph (2) subparagraph (a) is stricken and subparagraph (b) so modified as to eliminate therefrom all reference to Cairns. It remains in force as to Kershner. Subparagraph (c) remains in full force and effect except as to Charles Cairns. Subparagraph (d) is made applicable to 2(b) and (c) as modified and to 1(d). Subparagraph (e) is not modified. The order thus modified is enforced.