WESTERN ELECTRIC CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

POINT BREEZE EMPLOYEES ASS'N, Inc., v. SAME.

Nos. 5302, 5326.

Circuit Court of Appeals, Fourth Circuit.

Jan. 3, 1945.

Writ of Certiorari Denied April 9, 1945.

See 65 S.Ct. 1014.

---

SOPER, Circuit Judge, dissenting.

———◇———

Wilkie Bushby, of New York City (R. Dorsey Watkins and Piper, Watkins & Avirett, all of Baltimore, Md., William J. Butler and Root, Clark, Buckner & Ballantine, all of New York City, Walter L. Brown of Huntington, W. Va., and Carl K. Rang, of Washington, D. C., on the brief), for petitioner Western Electric Co.

Charles H. Dorn, of Baltimore, Md., for petitioner Point Breeze Employees Ass'n.

Frank J. Donner, Atty., National Labor Relations Board, of Washington, D. C. (Alvin J. Rockwell, Gen. Counsel, Malcolm F. Halliday, Associate Gen. Counsel, and Platonia P. Kaldes, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

These cases are before us on petitions by Western Electric Company and Point Breeze Employees Association (hereinafter referred to as the Company and the Association, respectively) to review and set aside an order of the National Labor Relations Board (hereinafter called the Board) issued on August 9, 1944, in a case under Section 10 of the National Labor Relations Act (herein called the Act), 29 U.

S.C.A. § 151 et seq., 49 Stat. 449, based upon a complaint filed by the International Association of Machinists. In its answer to the petitions, the Board has requested that its order be enforced.

On the filing of the complaint, extended hearings were conducted by the trial examiner. After full consideration and the taking of a great mass of testimony, the examiner found the existence of unfair labor practices within the meaning of the Act, in that the Association is a successor to, and stands in the same position as, the Employees Representation Plan (hereinafter called the Plan); that the Company dominated and interfered with the formation of the Plan and the Association and is dominating and interfering with the administration of the Association. The Board approved and substantially adopted the findings and conclusions of the examiner and issued the order involved in this appeal. This order directed the Company to cease and desist from: Dominating and interfering with the formation of, or contributing support to, any labor organization of its employees; recognizing the Association as a representative of its employees; or giving effect to any contracts with the Association. The Company was further ordered to post appropriate notices. The questions before us are whether the Board's findings are based on substantial evidence, and whether the disestablishment order based on these findings is a proper order.

The Company is a New York corporation, and a subsidiary of the American Telephone and Telegraph Company. It now operates, and did operate at the time of the acts in question, four main manufacturing plants in various sections of the United States. It is conceded that the Company is engaged in interstate commerce within the meaning of the Act. We are here concerned solely with activities of the Company's plant at Point Breeze, Maryland.

In the summer of 1933, in line with the requirements of Section 7(a) of the National Industrial Recovery Act, 49 Stat. 198, the Company established and sponsored the Plan at its several plants. In August, 1933, W. H. Meese, the Company's vice-president and works manager, called a meeting at the Point Breeze plant and announced that officials of the Company had drafted the Plan, proposed its adoption, and invited the employees to elect a committee to set up the mechanics for the selection of employee representatives. Thereafter, an election was held, and, with the holding of this election, the organization of the Plan was fully effected. Under the Plan, no employee was required to pay dues. All expenses of the Plan were borne by the Company and all employees automatically became members of the Plan. The Plan operated through three pyramided types of joint committees, though even the ranking committee had, in effect, no more than advisory authority. In 1934 the Company integrated the Plan in its four plants, but no material changes were made.

Neither the form nor the administration of the Plan was illegal prior to July 5, 1935, the date of the passage of the Act. The Board has found, however, and the evidence amply supports the finding, that after that date the Plan clearly violated both the language and the purpose of the Act. N.L.R.B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 268, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N.L. R.B. v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 249, 60 S.Ct. 203, 84 L.Ed. 219. This illegal plan operated openly until April, 1937, when the decision of the Supreme Court in N.L.R.B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, sustaining the constitutionality of the Act, was brought to the attention of the Company.

The crucial question in the instant case is whether the evidence supports the Board's finding that the Association is a successor to, and stands in the same position as, the Plan. By the terms of the Act we are bound by the findings of the Board unless it can be said that those findings are unsupported by substantial evidence, 29 U.S.C.A. § 160(f). And these findings of the Board are binding as to not only evidentiary facts, but also conclusions of fact which may reasonably be drawn therefrom. Virginia Electric & Power Co. v. N.L.R.B., 4 Cir., 132 F.2d 390, 395; N.L.R.B. v. Waterman S. S. Corporation, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; Martel Mills Corporation v. N.L.R.B., 4 Cir., 114 F.2d 624. Further, we may not substitute our own conclusions for those of the Board. Where the evidence admits of more than one inference, the choice of inference is properly for the Board, not for the courts. N.L.R. B. v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32; Montgomery Ward & Co. v.

522

N.L.R.B., 8 Cir., 115 F.2d 700; N.L.R.B. v. Christian Board of Publication, 8 Cir., 113 F.2d 678.

On, or shortly after, April 13, 1937, Hicok, the Company's superintendent of industrial relations, informed Scarborough, chairman of the Plan, that a pending meeting would not be held because there was doubt as to the legality of the Plan. On or about April 16, 1937, most of the seventeen employee-elected representatives were summoned to Meese's office and he told them that the Company could no longer "deal" with them. The testimony shows that information to the effect that the Plan was "out" was passed on to their constituents by these representatives. However, the Board found that the Company did not, by oral statement of any officer or other supervisory employee, or by written notice or otherwise, convey directly to its employees as a whole, as distinguished from the seventeen Plan representatives, the Company's intention no longer to recognize the Plan or to meet with its representatives.

■ The Company here strenuously argues that it is not compelled to follow any "ritualistic" form of notice, and that the fact that the knowledge of the disestablishment of the Plan was generally distributed to the employees is sufficient. No particular form of notice is required under the Act, yet any notice, to be valid, must constitute actual notice of the true situation, and not a statement of half facts from which many inferences might well be drawn.

Circulars distributed by the Plan representatives on April 21, 1937, the day before an election in which the entire number of Plan representatives were elected en bloc to act as bargaining agents for the employees for a period of sixty days, set forth information that was certainly not complete, correct though it may have been as far as it went. This circular, in part, stated the Plan "is no longer permitted because the management has been helping to pay the expense of it"; also, "It is necessary for us to form a New Plan or to have none at all." Further, employee Mileski testified that Schmidt, one of the Plan representatives, said: "We are forming a union, and since they have passed the Wagner Labor Act we want to keep out an outside organization" and that if an outside organization came in "We would lose our sick benefits and our vaca-

tions, and all our benefits we got from the Company." While these statements are not binding on the Company, they are important as tending to show the reactions to, and the interpretation of, Meese's speech by the employees.

■ It was not unreasonable for the Board to conclude, and we think the evidence reasonably supports the conclusion, that the employees were not "freed of the respondent's (Company's) domination of the Plan." In view of the Company's former active domination of the Plan, there is sound reason to believe the employees would consider that the "new Plan" had the hearty approval of the Company. The Board found that this brand of second hand notice "lacked the sanction and authority which attach to pronouncements of an employer concerning his employees." Half truths and partial notice are not sufficient to eradicate completely the effect of domination over a prior employee organization, nor do they indicate a complete abandonment of the old, and a distinct beginning of the new. N.L.R.B. v. Moore-Lowry Flour Mills Co., 10 Cir., 122 F.2d 419; N.L.R.B. v. Continental Oil Co., 10 Cir., 121 F.2d 120.

It is not unimportant that subsequent to the notice relied on by the Company, the Company on April 15, 20 and 22, 1937, met in joint committee with these same seventeen Plan representatives and discussed grievances concerning wages, hospitalization, and other questions. Such conduct on the part of the Company draws no such definite and clear line of cleavage between the two organizations as would free the Association from any taint of employer domination. N.L.R.B. v. Condenser Corporation of America, 3 Cir., 128 F.2d 67.

It seems clear that both the Plan representatives and, judging from current conduct, the Company, considered these seventeen to still be the "duly elected" representatives of the employees between the time of the alleged notice of April 13 and the date of the election, April 22. The representatives themselves speak of "carrying on."

■ On April 19, 1937, a circular was issued over the signature "Elected Representative, Hourly Rated Employees." On this point the Company urges that the acts of the employee-representatives are of no concern to, and do not bind, the Company. In answer to this it might be pointed out that at the date of the alleged disestab-

lishment of the Plan, the Company had been pursuing, for almost two years, a course of conduct in open disregard of the dictates of the Act. In the face of this fact it was not a proper procedure for the Company to sit idly by and to allow the Plan representatives to deal with the employees on the basis of an ambiguous statement by the Company itself. A duty devolved upon the Company openly and plainly to disavow any intention thenceforth to continue its interference. N.L.R.B. v. McLain Firebrick Co., 3 Cir., 128 F.2d 393. As this Court said in E. I. duPont de Nemours & Co. v. N.L.R.B., 4 Cir., 116 F.2d 388, 395:

"* * * where an employer, without any public disavowal of a previously company-dominated union, has silently stood by and watched a new organization grow out of the smoldering ashes of the old union, 'disestablishment' of the second organization may still be ordered."

█ Nor may the Company adopt a "convenient unawareness" so as to further its own ends. American Smelting & Refining Co. v. N.L.R.B., 5 Cir., 128 F.2d 345, 346.

Counsel for the Company contend that a letter from the Company's New York headquarters that arrived on the morning of April 22, 1937, gave clear instructions to the plant manager that he was to inform the employees of the Company's indifference to the organizational effort of the employees. Timely notice to the employees of this letter might well have caused a different result in the election held on the same day. Moreover, so long as this letter remained, in effect, in the breast of the Company, it could in no way dissipate, in the minds of the employees, any impressions acquired as a result of the conduct of the Company and the representatives of the Company-dominated Plan.

In commenting on the Newport News case, supra, Circuit Judge Learned Hand, in Westinghouse Electric & Manufacturing Co. v. N.L.R.B., 2 Cir., 112 F.2d 657, 660, affirmed in 312 U.S. 660, 61 S.Ct. 736, 85 L. Ed. 1108, used words that are very much in point here:

"* * * although the new union would be lawful, if freely formed, it had in fact arisen out of the earlier organization, and the company had done nothing to mark the separation between the two, and publicly to deprive the successor of the advantage of its apparently continued favor.

* * * the employees at large had not been advised that the company was wholly indifferent whether they joined the new union, and that, as it might, and probably did, appear to be a successor of the old, the separation should have been made plain, and with it the discontinuance of any continued countenance from the employer. * * * the Board may take it as datum, in the absence of satisfactory evidence to the contrary, that the employees will suppose that the company approves the new, as it did the old, and that their choice is for that reason not as free as the statute demands." ♦

As we pointed out above, the vote for seventeen Plan representatives was either for or against, as a single unit, to handle any bargaining controversies for the ensuing sixty days. It is true that even under an unquestionably fair election, "leadership will out," and labor leaders under one plan are more than apt to continue their leadership in a subsequent organization, yet in this case, had there been proper notice to the employees, the same Plan representatives might or might not have been chosen to guide the policies of the new organization. The Board has found that there was no such freedom of choice as was intended by the Act. International Ass'n of Machinists Tool & Die Makers Lodge No. 35 v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

█ There is substantial evidence to support the conclusion reached by the Board that, under the circumstances obtaining in this case, these Plan representatives were unable to emancipate themselves from the domination of the Company so as to represent the employees fairly. Cf. N.L. R.B. v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396.

Counsel for the Company strongly rely upon N.L.R.B. v. Duncan Foundry & Mach. Works, Inc., 7 Cir., 142 F.2d 594, to support their contentions. In that case, however, there was a "clear understanding of the attitude of the employer in this regard upon the part of the employees." In the instant case, the Board has found that the Company failed properly to bring home to its employees that it was completely indifferent to their organizational efforts. We think there is substantial evidence to support this finding.

█ The Company points out that the Association election was carried by a large majority. This is the expected result in a

**524**

dominated election. If, however, dominance is present, the fact that a large majority voted for the Plan representatives is not controlling. N.L.R.B. v. Condenser Corporation of America, 3 Cir., 128 F.2d 67. See, also, Bethlehem Shipbuilding Corporation, Ltd., v. N.L.R.B., 1 Cir., 114 F.2d 930, certiorari dismissed 312 U.S. 710, 61 S.Ct. 448, 85 L.Ed. 1141.

Counsel for the Company contend that the Association is now completely emancipated from the control of the Company; that it is unusually "militant" in its bargaining attitude. In the face of this contention, the Board has found from the credible evidence that interference on the part of the Company has existed since the formation of the Association, and still exists. In 1941 and 1942, the election of representatives was held on Company property and Company time, without objection by any supervisory employee. Pamphlets of the Association were distributed without objection. Employees were signed up by the Association on Company time with knowledge of Mercer, a supervisor.

About 1939, Leichsenring, a supervisory employee, said to employee Mileski, "All employees must have something else besides the goodwill of the Company and it would be better for a man to join a union that the Company approved of than an outside union." It seems clear that Association members knew they could solicit on Company time, and non-Association employees would seem to have been just as certain they could not because they had no majority.

Disparaging remarks were passed by several supervisory employees concerning outside unions. Thus, employee Moore testified that, in May, 1943, W. D. Pollock, group chief of the inspectors, asked her if she "belonged to the Union (I.A.M.)," and that when she replied in the affirmative, he told her "to stay the hell away from his girls or I would find myself throwed out." While isolated anti-union remarks by supervisory employees may be neither vital nor controlling, they may yet serve to lend color to the over-all picture.

The Company maintained a measure of control over the Association by reason of the fact that the representative lost his representation if transferred to another department. Smith, one of the employee representatives, was so transferred in 1942. There was evidence tending to establish interference on the part of

the Company within the meaning of the Act. N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549. It was for the Board to determine from the facts and reasonable inferences, the "whole congeries of facts," whether domination or interference was present. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct 358, 85 L.Ed. 368.

Further, even if the old practices had been abandoned, it would be within the discretion of the Board to order that the Association be disestablished as a means of eradicating the effect of past unfair labor practices. American Enka Corp. v. N.L.R.B., 4 Cir., 119 F.2d 60, 63; see N.L.R.B. v Newport News Shipbuilding & Dry Dock Co., supra. As Mr. Justice Reed stated in N.L.R.B. v. Southern Bell Tel. & Tel. Co., 319 U.S. 50, 60, 63 S.Ct. 905, 910, 87 L.Ed. 1250:

"Since the Association prior to the passage of the National Labor Relations Act in 1935 was obviously a company dominated and supported union, the question of the weight to be given the passage of time or subsequent efforts to dissipate the effect of this early domination is for the Board. Its conclusion is an inference of fact which may not be set aside upon judicial review, because the courts would have drawn a different inference. National Labor Relations Board v. [Pennsylvania] Greyhound Lines, 303 U.S. 261, 270, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 311, 84 L.Ed. 396.

Here, we think there was again substantial evidence to support the Board's finding that the Association was a successor to the Plan and was a product of the Company's interference. Roebling Employees Ass'n v. N.L.R.B., 3 Cir., 120 F.2d 289. The disestablishment of the Association then becomes necessary to give to the employees the essential untrammelled freedom for the creation of a free and independent bargaining unit. N.L.R.B. v. Southern Bell Tel. & Tel. Co., supra.

In brief summary, there was substantial evidence tending to show: (1) The Plan was clearly dominated by the Company; (2) an equivocal second-hand announcement as to the dissolution of the Plan; (3) meetings by Company officials with the old Plan representatives between the end of the Plan and the beginning of the As-

sociation; (4) striking similarities between the personnel and the internal structure of the Plan and the Association; (5) an obvious belief by the employees that the Company desired an independent, rather than an outside, union; (6) swift grant to the Association by the Company of a check-off of dues, wage increases and other favors; (7) expressions of opinions hostile to outside unions made by supervisory officials to employees.

Finally, there is the contention running through the briefs and oral argument of the Company, that the attention of the Board has been focused, and its order based, solely upon the dead past, when the Plan was in active operation. The Board, upon proper evidence, has found this past to be not dead, nor even sleeping, but rather to be a continuing vital influence. In other words, the Board has interpreted the present in the light of both the past and the circumstances that projected this past into the present. In labor relations, as well as in art, the background may strongly color, or even dominate, the whole picture.

The petitions by the Company and the Association will be denied and the order of the Board will be enforced.

Order enforced.

SOPER, Circuit Judge (dissenting).

There is in this case no evidence that the Western Electric Company dominated or interfered with the formation or administration of the Point Breeze Employees' Association, Inc., a labor union composed of the employees of the Company's Baltimore plant; and there is no evidence, worthy of the name, that the Company discriminated in favor of the Association and against the International Association of Machinists, A. F. of L., a labor union that was endeavoring in 1943 to gain a foothold in the plant. There is abundant evidence that a predominant majority of the employees preferred the Association as a bargaining representative and it may be fairly inferred that the Company held the same view; but that preference involved no violation of the National Labor Relations Act.

The correctness of these unqualified statements and the absence of any support for the contrary conclusions of the National Labor Relations Board are easily demonstrated. The charges brought by the Board against the Company on behalf of the I. A. M. fall into two classes, namely illegal domination of and interference with the Association and illegal discrimination in its favor and against the I. A. M. The charge of domination and interference will be first considered.

The Company began to bargain collectively with its employees in 1933, under a Plan in somewhat general use in large industries at the time, and continued to do so until April, 1937, when the Supreme Court, putting aside certain views that it had previously held, announced that the National Labor Relations Act was constitutional. The Plan seems to have worked well; but it contained certain provisions repugnant to the statute in that they tended to deprive the men of that complete freedom from company control and that complete independence in the exercise of the right of collective bargaining which the Act was intended to guarantee. The main defects in the Plan as pointed out in the opinion of the Board, were as follows: (1) The Plan provided for the maintenance of the Point Breeze Joint Committee composed of representatives of management, including the works manager, and representatives of the men. There were also other joint committees similarly composed but authoritative control was lodged in the Point Breeze Joint Committee. However, its functions were merely advisory and it had no authority to bind the management. Moreover, matters not settled by it were referred to higher officers of the company for review. (2) The Plan made no provision for meetings of the representatives of the men separate and apart from meetings of the joint committees. (3) The Plan made no provision for the election of employees to membership but all became members of the Plan automatically. (4) The employees paid no dues. (5) The Company paid all expenses of the Plan and paid the representatives while they exercised their functions. (6) Elections and committee meetings were held during working hours. There were other defects in the operation of the Plan not mentioned in the Board's opinion. The employees had no power to amend the Plan. Whenever the employees' representatives met separately from the joint committee, they submitted detailed minutes to management. Employees were informed of the proceedings of the joint committees through digests prepared by management which were posted in the plant and otherwise distributed to the men.

526

These features of the Plan were obnoxious to the statute. Accordingly, the Company, of its own initiative, took prompt action to disestablish the Plan shortly after the Jones and Laughlin decision; and a new organization, called the Point Breeze Employees Association, Inc., from which the objectionable features of the Plan were omitted, was set up by the men, acting independently and free from company interference or control. The Board, nevertheless, held that the new association, like the Plan, was dominated by the Company, and it is necessary to examine the undisputed evidence in the record in order to test the validity of this finding.

A few days after April 12, 1937, when the Jones and Laughlin decision was handed down, the works manager announced at a meeting of employee representatives that the Plan was "out"; that it was at an end; that the company could no longer bargain with them and that the employees were free to set up or join any organization that they desired. The precise date of this meeting is in doubt. The Board said that it took place about April 16, 1937. Meetings of the joint committee for ordinary bargaining purposes under the Plan were held on April 15, April 20 and April 22 respectively, but no action was taken. On the morning of April 22 the manager of the plant received a letter from the Company's headquarters in New York giving him explicit instructions to give notice of the termination of the Plan and of the indifference of the Company to the organizational efforts of the employees. After April 22 all operations under the Plan ceased, and bargaining was not resumed until after the new association was organized in June.

The employee representatives passed on the notice received from the Company to their constituents. The representatives, nearly all of whom testified, were unanimous in saying that they reported to the men what had taken place at the meeting with the manager. Their uncontradicted evidence made it abundantly clear that the Plan was out, that they could no longer represent the men or bargain with the management, that the men would have to get a new union or form one of their own or choose any organization that they preferred, and that it was immaterial to the Company what action they might take. This information passed through the body of the employees like wild fire, but it did not come with the shock of a surprise because the men, by reason of their familiarity with labor matters were expecting it.

The Board, in holding that there was no clean break in the minds of the men between the old Plan and the new association, gave great weight to the fact that the Company did not itself directly notify the employees as a whole that it would no longer recognize the Plan. It is suggested that the statements of the representatives lacked the sanction and authority which attaches to the pronouncements of a company to its employees, and that in this instance the employees did not get a clear idea of the Company's attitude or of their complete freedom of choice in the premises. There is no justification whatsoever for this argument. The men were told in unmistakable terms that the Company would no longer recognize the old Plan and that they must have a new organization if they were to continue to bargain collectively and that they were free to do as they pleased. In view of these undisputed facts and of the torrent of publicity that swept over the labor world upon the announcement of the Supreme Court's decision, it is preposterous to suggest that the men were not fully cognizant of their rights.

The facts of the case differ materially from those considered in N.L.R.B. v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, where the new association was merely a revision of the old Plan and retained some of its defects; and also from the facts before the court in Westinghouse Electric & Manufacturing Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, affirmed 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108, where the Company's statement to the representatives was not relayed to the employees themselves. The case at bar resembles National Labor Relations Board v. Duncan F. & M. Works, 7 Cir., 142 F.2d 594, where the employer did not directly notify each employee that an existing defective Plan had ceased to function but the employees nevertheless clearly understood this to be the fact. The court said, at page 596 of 142 F.2d:

"We think the Board's evidence justifies only the finding that, in the hearing here, the test was fully met. True, respondent did not circularize each member of the E.R.P. with notice of cessation of support of the E.R.P. However, we cannot, nor can the Board, after seven years, say that it was necessary for respondent to follow

any certain formal mechanical pattern of procedure in order to evince disestablishment, inasmuch as the evidence establishes beyond peradventure an honest, active and successful effort by respondent to effectuate its detachment, and clear understanding of the attitude of the employer in this regard upon the part of the employees."

In the pending case, the complete disestablishment of the Plan was also forcefully brought home to the men by the deliberately planned steps to form the new association which were publicly taken in the succeeding weeks. It had become clear to the employees that unless they took some step to reorganize anew, all collective bargaining was at an end. No outside union was endeavoring to organize them and they were accustomed to a union confined to the company's plants. In this emergency the employees' representatives naturally took the lead. Indeed this step was suggested to them during their conferences with the men. They met in private homes and other places outside the plant, employed expert counsel, sent out circulars notifying the men that a new organization would be necessary, and that an election would be held to decide whether or not the old representatives should continue to represent them until a new organization could be formed and whether or not the old representatives should prepare within sixty days a form of organization for submission to the workers. For this purpose an election was held which resulted in a vote of 1874 for and 26 against the requested authority. The Company had no part in any of these transactions.

The organizing committee thus chosen requested and received recognition from the Company as a bargaining agent. The Board accepts as evidence of continued Company domination that for sixty days the seventeen old employee representatives under the Plan had the right to speak for the employees. The evidence furnishes no support for such an inference. The committeemen were chosen by the employees in an election conducted free from company domination, their authority was limited to sixty days, and was terminated six years before the pending charges were brought. This episode which occurred in 1937 has no tendency to show Company domination in 1943, when the Board rendered its decision.

The members of the organizing committee met on their own time outside the plant and with the aid of an attorney drafted by-laws on or before June 1, 1937. The committee considered a number of forms, including the old Plan, but departed from it, eliminating in the process all semblance of Company control. The new Plan was submitted to the employees in an election on June 12 and June 14, 1937, which was held outside the plant. Three separate ballots were provided by which the voter could indicate, after stating that he had received and read the proposed by-laws, (1) whether he was for or against the new Association; (2) whether he desired to be a member thereof, and (3) what person he desired as his representative by writing the name on the ballot. No nominations for representatives were made. The vote was overwhelming in favor of adopting the plan. Twenty-four members were chosen for the first Board of Representatives, of whom thirteen had been representative under the old Plan and eleven were new men. All expenses were paid by the organizing committee who were later repaid by the Association. The Company had no part or share of any kind in the election.

The Board accepted certain printed statements contained in the history of the Plan and in the foreword to the by-laws and submitted to the men before the election, as evidence that the Association was merely the old Company dominated Plan in another form. Therein it was said that the old Plan had been beneficial and that the new Association was not formed for warlike purposes. The statement in the history was made in respect to an extension in 1934 of the old Plan unto a Company-wide organization for collective bargaining in all four of the Company's plants. It was as follows:

"As a result of the adoption of this Company-wide Plan of collective bargaining, many matters of labor relations were amicably discussed and agreements reached which advanced and protected the interests and rights of the employees."

It is not suggested that this statement was not entirely true, nor does it seem reprehensible in breaking with the past to speak gratefully of its accomplishments.

Militancy was discussed in the foreword to the by-laws in these terms:

"The Association is not formed along militant lines. While its purpose is to obtain for each worker fair treatment and decent working conditions and to fight for what is believed to be right and proper, it

is hoped that it will be able to function and meet in an amicable manner with the management."

One cannot reasonably find fault with a declaration of policy which proposes to fight for one's rights, if necessary, but prefers amicable adjustment. It is indeed reminiscent of the preamble to the National Labor Relations Act which speaks of promoting the flow of commerce "by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours or other working conditions and by restoring equality of bargaining power between employers and employees."

Next, the Board finds evidence of company domination and interference in the provision of the by-laws of the Association with regard to the election of representatives by the employees. The members of the Association were divided into three departments and these in turn into twenty-four districts, with one representative to be elected for each district. In this connection the Board said:

"The provision that representatives should be chosen from voting districts and should represent only their respective districts, furnishes sufficient insurance against the representatives becoming genuinely independent. The respondent can deprive a duly elected officer or representative of his office and his representative status by discharging him, or by transferring him to another voting district."

The Board was mistaken in this statement of fact. The old Plan provided that if a representative were transferred, he might lose his office. But the Association's by-laws, adopted in June, 1937, had no such provision. There was such a provision in the by-laws adopted in 1942 and on one occasion in that year it was given effect; but it was eliminated by the Association in May, 1943. The complaint in the pending case was not filed until July 2, 1943.

There is no merit in the suggestion of the Board, contained in the above quoted passage from its opinion, that company domination is found in the right of the company to discharge an elected officer or representative and thereby deprive him of his office. The by-laws of the Association provide that if a majority of the representatives decide that the termination of an employment involved unfair labor practice, the membership of the employee shall not be terminated and he shall be entitled to the protective and bargaining services of the Association. In the Westinghouse case, 2 Cir., 112 F.2d 657, affirmed 312 U.S. 660, 61 S.Ct. 736, 85 L.Ed. 1108, the court pointed out that there is an opportunity for company domination whenever the constitution of an inside union provides that an officer of the union must be in the company's employ, but nevertheless held that this circumstance should not count as a factor of domination, for it is inevitable in any union whose members are confined to company employees. It is obvious that the remedy in such a case is to be found in the protective provisions of the statute, as is suggested in the provisions of the by-laws above mentioned.

The Board suggests that by reason of the election of June, 1937 the employees were moved as a mass into the Association and that their acceptance of the Association was not their free and voluntary act. This statement is quite inaccurate. Each employee was given the individual opportunity in the election to say whether he desired the Association to act as bargaining agent for him and whether he desired to be a member of the Association and to submit to the check off, and to name the employee whom he desired to represent him. There was no coercion from any source and no participation by the Company in the election in any way. Every employee had an opportunity to read a copy of the by-laws which were printed and distributed before the election. The instructions on the ballot were clear and explicit and no slate of representatives was proposed. It is true that the choice of the employees lay between the Association and no organization at all but the Board has sanctioned elections of this sort and the courts have approved them. Calumet Steel Division of Borg-Warner Corp., 4 N.L.R.B. 45, 60; National Labor Relations Board v. National Mineral Co., 7 Cir., 134 F.2d 424, 427, 428, certiorari denied 320 U.S. 753, 64 S. Ct. 58; National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, 881, certiorari denied 319 U.S. 751, 63 S.Ct. 1164, two cases, 87 L.Ed. 1705. Even if the employees had not been given a fair chance to express their views, the Company could not be accused of domination for it had no part in the election.

No inference of Company domination can be drawn from the mere fact that the employees of their own free will selected thirteen of the employee representatives un-

der the old Plan to serve with eleven other men upon the Board of Representatives of the Association for the first year of its life. It was entirely natural that officials who had served the employees well in the past should be given places of responsibility in the new set up. There is not a shred of evidence that the Company in any way interfered with the free choice of the voters.

After the election, the Association requested a bargaining conference with the Company; and the Company thereupon recognized the Association, subject to verification of its claim to represent a majority of the employees, which was promptly furnished. Shortly thereafter, at a conference between representatives of the Company and of the Association, and of the latter's attorney, a ten per cent wage increase and pay roll deductions for Association dues were discussed. The attorney urged that unless deductions for dues were allowed, the Association would fail and fall into the hands of other labor organizations. The Company agreed to a six per cent wage increase and to a pay roll deduction upon a written assignment of wages for the purpose. These transactions indicated a desire on the part of the Association to maintain control of the situation, and a preference on the part of the Company towards the inside union, but they do not indicate that the Company dominated or controlled the Association, and they are not mentioned in the Board's argument as having this significance.

All the surrounding circumstances of this case indicate that the following paragraph from the foreword to the by-laws of the Association correctly described the understanding held by the employees who established it and elected the new board of representatives, namely:

"This entire Plan is dedicated to the free and unrestricted representation of each and every hourly rated employee at the Point Breeze plant, and those in charge of its management will be expected to devote themselves freely and honestly to the welfare of every worker at the plant."

The charge that the men were not fully aware that a radical change had taken place in the character of their representative body, and that they were not afforded a fair opportunity to express their views in the formation of the Association involves the unwarranted assumption that they were not possessed of ordinary intelligence. The view of this court in a

similar situation was expressed by Judge Dobie in E. I. DuPont De Nemours & Co. v. National Labor Relations Board, 4 Cir., 116 F.2d 388, 398, as follows:

"We are of the opinion that the labor group is now quite aware of its statutory rights, and is instilled with an aggressive spirit that, before the passage of the Act, may long have been kept dormant. The still picture of a sheep-like body of laboring men, placidly led by a dominating employer, is not representative of the true situation. Since the passage of the Act, the picture has been quite effectively streamlined. We see today a mobile labor force, strengthened by statutory safeguards, working on comparatively even terms with the employer, who may often owe his particular strength to a superior economic, educational and social position. Under this view of the modern industrial situation, we surely cannot indulge in any assumption of weakness on the part of the employee; certainly we cannot vary the specific terminology of the Act to meet these alleged weaknesses. As Judge Hutcheson admirably stated in Magnolia Petroleum Co. v. National Labor Relations Board, supra, [5 Cir.] 112 F.2d [545] at pages 549, 550: 'It (the Act) nowhere provides, and there is no warrant in it for the view, that preference by employees for an unaffiliated as against a national affiliated organization, raises a presumption that this preference was coerced or brought by the employer. Indeed, *the statute goes on exactly the contrary presumption, that employees have the intelligence and character requisite for self-organization, either by joining an existing labor organization or forming one of their own.'* (Italics ours)."

What has been said shows that in its origin and in its form of government the Association was completely free from Company domination and interference. What follows shows with equal certainty that in its administration the Association has remained the free and uncontrolled representative of the men. It is incorporated under the Maryland law with a board of representatives or directors, now consisting of thirty-nine men who in turn elect the officers. The board meets monthly and more often when necessary. The members meet at least once a year. The expenses are met entirely from the dues and property of the Association without outside aid from any source.

Radical changes in personnel have occurred during the six year period since the Association was organized in June, 1937. There were then 1872 employees at the plant; at the present time 5100. In September, 1937 there were 1772 members and in May, 1943 2896 members. There is no closed shop agreement requiring any employees to come into the Association. The Board of Governors, which originally consisted of 24, now has 39 elected members, and in 1943 only 2 of these were on the Board in 1937. None of the officers of the Association elected in June, 1937 were officers in 1943.

It seems obvious, in view of these changes, that even if there had been unlawful Company influence or domination in the establishment of the Association, it would long since have been dissipated. In any event, the undisputed facts demonstrate the complete independence of the Association. Its Board of Representatives has been active on behalf of the men. There were 140 bargaining conferences between the Company and the Association in the period 1937 to 1943. In 1939 the Association was affiliated with a national committee consisting of representatives of the unions in the Company's different plants and division. This organization has bargained with the Company on matters of Company-wide application in seventy conferences between 1939 and 1943. The record of these transactions indicates collective bargaining in the orthodox manner between active and independent parties and contains no hint that at any time the Board of Representatives has failed to represent the employees or has been coerced or interfered with in the exercise of its functions by the Company.

The clearest evidence of this fact, which is entirely ignored in the opinion of the Board, is the report of the War Labor Board at the conclusion of a proceeding in which that Board undertook to resolve an impasse between the Company and the Association in respect to certain matters in dispute. The attitude of the Association and of the Company representing their respective sides showed such independence and militancy that the Board in its final report on April 30, 1943 criticized them both in the following language:

"The two parties appear to have bargained as company and union since 1937, a very short time. With the best of intentions, the difficulties attendant upon the development of new ways of thinking and of dealing are not easily resolved in the early years of collective bargaining. Neither party is entirely sure of itself or of the other. Under wartime pressures, it is doubly hard to learn by studying the experience of others, or by devoting adequate time to one's own problems. Consequently, differences of opinion drag on and become serious obstacles to cooperation. A tendency to question the sincerity and motives of the other side creeps in. If to this is added some degree of aggressiveness on either side, continual irritation seems bound to ensue.

"Something of this sort seems to be true in this case. The remedy appears to be to expedite in every possible way the development of one complete collective agreement, which would be sufficiently complete and accurate that it would remain in force indefinitely. This Company and this Union should be encouraged to draw closer together for the benefit of all concerned."

What more convincing affirmative proof of the Association's complete freedom from undue influence of the Company could be had than this finding of an impartial and responsible agency? One may well ask what standard of conduct the participants in an industry should adopt when one agency of the government condemns their relations as unduly intimate and close, while another government agency at the same time stigmatizes their attitude towards each other as so hostile as to interfere with efficient production.

The Board has stated another conclusion adverse to the Company in finding that it has supported and discriminated in favor of the Association and against the I.A.M. in respect to certain union activities. None of these matters bear any relation to the establishment of the Association in 1937, which has been heretofore described, for the first alleged improper action took place in 1941. By that time the Association had not only been freely formed but had been bargaining independently with the Company for four years. The incidents, therefore, do not tend to show company domination, but at most the Company's preference for an established agency rather than with one seeking to get a foothold in the plant.

In truth, the incidents are so trivial that the trial examiner rejected them from consideration and recommended that the charge of discrimination be dismissed. The I.A.M. took no exception to this recom-

mendation but asked the Board to adopt the trial examiner's report as its own. The incidents in question were not even discussed in oral argument before the Board. Their flimsy character is apparent from the following recital: The Board said that the Company afforded "support to the Association by permitting it to hold elections on Company property during working hours". There was evidence that in an election in 1941 to fill a vacancy on the Board of Representatives the ballots were distributed by one representative during working hours and he was followed by another representative with a ballot box. A similar episode occurred in 1942 when ballots were distributed to employees and collected in a ballot box placed near the time clock. An informal election occurred in 1942 when a representative who was about to be promoted canvassed the employees for their oral approval of his successor. Undoubtedly these transactions served the convenience of the employees but they are without other significance. They did not show Company domination; and they indicated no discrimination in favor of one union and against another, for no other labor organization sought members in the plant until the I.A.M. began organizational activities in February, 1943.

The Board also charged that the Company allowed solicitation for membership in the Association inside the plant. The record shows no solicitation of members in the plant by the Association prior to 1943 and no evidence that even then solicitation was knowingly permitted by the Company or its supervisory employees. On the contrary, solicitation of members, distribution of literature and transaction of union business on the Company's property during working hours was forbidden by general rule with the exception that collective bargaining and the investigation and discussion of grievances were permissible. Representatives of the Association were permitted without question on the part of the Company to punch out and take time off at their own expense to conduct these legitimate activities. There is evidence that in 1943 on one or two occasions an employee solicited members in the plant, but no testimony that any supervisory employee had knowledge of this infraction of the rule. There is also evidence that on one occasion in 1943, after the pending complaint was issued, an Association publication was distributed in the plant; but there is no evidence that the

matter came to the Company's knowledge. These incidents in 1941, 1942 and 1943, taken alone or in connection with the formation and administration of the Association in prior years, furnish no basis for the finding of Company domination.

Finally we come to the evidence on which the Board rests its finding that in 1943 the Company was guilty of discriminatory conduct in favor of the Association and against the I.A.M. None of these incidents indicated Company domination; at most, they indicate discrimination in favor of the Association which by that time, as we have seen, was firmly established as a free and aggressive representative of the interests of the employees. Even when these occurrences are considered from the viewpoint of discriminatory conduct, they appear to be merely isolated instances of preferential conduct on the part of a few minor supervisory employees, and they do not show that the offenders spoke for the Company or that the I.A.M. was impeded in any material way in the assertion of its rights. On one occasion an I.A.M. organizer was stopped by a supervisor from getting signatures to an I.A.M. petition during working hours in the plant on the ground that this activity violated the company's rule. The Board condemned this action on the part of the supervisor because he failed to advise the organizer to punch out and circulate the petition on his own time; but this criticism is without foundation because it involves the assumption that members of the Association were permitted to check out in order to solicit members, an assumption directly contrary to the undisputed testimony that solicitation of members was regarded as a violation of the Company's rule.

There was also evidence of a few isolated transactions in 1943 in which supervisory employees made statements derogatory to unions generally. On one occasion an I.A.M. organizer said to an old friend and neighbor, who was a supervisor of the Company, that the employees needed a change of representation, to which the supervisor replied that such a change might result in loss of sick benefits and holiday pay. In the same year a department chief made disparaging statements regarding unions generally to an I.A.M. organizer, a friend, who was about to leave the Company's employ. On another occasion an I.A.M. organizer opened a discussion of labor matters with a supervisor who made

532

disparaging remarks about all unions. In May, 1943 a woman employee placed her A.F. of L. badge on the coat of a supervisor without his consent, whereupon he asked her if she belonged to the union, and told her to stay away from the girls under his supervision. In June, 1943 a woman employee started a conversation with a new supervisor regarding unions, during the course of which he made a remark favoring an association against outside unions. None of these transactions involved any coercion or disciplinary action or unfair treatment of any of the employees of the Company. All of the statements were made by minor employees and there is no evidence that they spoke with the authority or approval of the Company. Much more serious actions and statements by more highly placed officials have been held by this and other courts to be insufficient to justify disciplinary action against the employer by the Board. See, National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 83 L.Ed. 682; Jacksonville Paper Co. v. National Labor Relations Board, 5 Cir., 137 F.2d 148, 152, 153, certiorari denied 320 U.S. 772, 64 S.Ct. 84; National Labor Relations Board v. Clarksburg Pub. Co., 4 Cir., 120 F.2d 976, 979; E. I. du Pont de Nemours & Co. v. National Labor Relations Board, 4 Cir., 116 F.2d 388, certiorari denied 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529; Martel Mills Corporation v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 633, 634; National Labor Relations Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796, 799; Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85, 92.

In N.L.R.B. v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796, 799, 800, we said:

"While the extent and effect of activities of foremen and others connected with the management should be carefully scrutinized in such cases, because experience has shown that organization of these independent associations is frequently resorted to by the employer as a means of defeating real collective bargaining, it must nevertheless be remembered that independent associations, if free of employer domination, are recognized by the law as proper bargaining agencies and are entitled to recognition as such if they represent the free choice of a majority."

The order of the Board in the pending case should not receive the approval of this court. Finding the facts in labor disputes and prescribing remedies for infractions of the labor statute in order to effectuate its purposes are functions of the Board; but when the claim is made that there is no substantial evidence to support a finding of the Board, a question of law arises which the courts must decide. In the pending case there is no charge that any employee has suffered from an unfair labor practice on the part of the Company and there is no factual foundation for the finding of the Board that the Company has dominated the Association or discriminated against the I.A.M. The order of the Board should be set aside.