TEXAS CO. v. NATIONAL LABOR RE-
LATIONS BOARD.

No. 7456.

Circuit Court of Appeals, Seventh Circuit.

March 19, 1941.

Oscar John Dorwin, of New York City, James H. Pipkin, of Houston, Tex., and J. T. Nielsen, of Chicago, Ill., for petitioner.

Morris P. Glushien, of Washington, D. C., of counsel (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Assoc. Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel Sylvester Garrett, and William J. Isaacson, all of Washington, D. C., on the brief), for National Labor Relations Board.

Before EVANS and MAJOR, Circuit Judges, and BRIGGLE, District Judge.

EVANS, Circuit Judge.

The employer seeks to review, and the Board to enforce, an order directing the former to cease and desist dominating or interfering with the two named employee groups, or with the formation or administration of any other labor organization of its employees, etc.

Determinative of the relief which we grant, are two factual inquiries: (a) Was the new employee organization an outgrowth and successor of the old company-dominated organization of its employees? (b) Was the employer's dominating influence present in the labor union? In other words, does the case fall within the rule announced, and the factual situations disclosed, in the cases of Labor Board v. Link-Belt Co., 61 S.Ct. 358, 85 L.Ed. ——, decided January 6, 1941; Labor Board v. Newport News Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; and Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657, affirmed per curiam, March 10, 1941, 61 S.Ct. 736, 85 L.Ed. ——?

The facts are unusually free from dispute. Strange as it may seem, most of the facts are either stipulated or are docu-

mentary. The order directs cessation of domination of both organizations and the disestablishment of the new one.

The old employees' organization was clearly, if not admittedly, created and dominated by the employer. It was known as the "Employees' Representation Plan." Here it will be called the Plan. The new organization, "The Employees' Collective Bargaining Agency," a nonaffiliated labor organization, we will call the Agency.

The Company conceived and gave to its employees the Plan. Our inquiry is to ascertain the status of the Agency. Was it a company-fostered union,—a successor to the Plan, or an independent employee group?

█ The numerous cases, of which the above-cited ones are typical, make it tolerably clear that the correct rule of law necessitates affirmance if the evidence, however slight, be substantial and support the findings of the Board.

█ While the indicia of company participation or domination may be numerous, the following are the more or less common types which have received recognition, if not emphasis, from the courts when considering cases which present the same inquiry. (1) Organization of a union to "succeed" or "continue" a Company union which suspended immediately after Supreme Court decision upholding the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.; (2) organization on Company time and property; (3) lack of dues, and support by mere contributions; (4) similarity in union structure between old and new unions; (5) similarity of official personnel of the former and new unions; (6) failure of the Company to "broadcast" to all employees its impartiality in selection of union; (7) acts of the Company indicative of its preference for or against a particular union; (8) its maintenance of a Company union long after the enactment of the Wagner Act as indicative of the Company's attitude towards unions generally; (9) statements of all these factors are the "imponderables which the Board was entitled to appraise" in determining whether the Company dominated and fostered the new union.

A careful reading of the precedents on this subject discloses facts more accusing than those presented by this record. We, nevertheless, must conclude that the criteria, above outlined, find some factual application and support in the present record.

Briefly, we shall attempt to point out such evidence.

The Employer produces crude oil in Texas and employs over 3800 employees. Until 1933 there had been no employee organization of any kind. In June of that year, the Company prepared the Plan, which was adopted. About 80% of the eligible employees voted, electing representatives to a Council which was composed of an equal number of employee and management representatives. No dues were payable; the Company defrayed the expenses and provided election facilities. Wage increases occurred (the Board holds such increases occurred only on the suggestion of the management). Representatives were paid regular wages for the time spent at council meetings.

In March of 1937, the C. I. O. announced its intention to conduct an intensive campaign for membership. On May 13, 1937, a meeting of the Plan council was called by one Bennett, its secretary. No representative of the Company was present. The minutes of this meeting—held in the Company dining room—read in part:

"The purpose of this meeting was explained by Mr. Bennett, as, in brief, to *reorganize* the present employee-management council plan *or* to develop a new plan to take its place. Read an excerpt from minutes of last Council meeting at which Mr. Wallace (manager) expressed his views on the present plan and the advisability of retaining it, as follows:

"Mr. Wallace advised that the present Employee Representation Plan is *satisfactory* under the Wagner Act, * * *

"Advised that the *Council Members* should feel perfectly free to *modify* or change the present Plan or adopt any other form of bargaining with the Management. Pointed out that the Management cannot work out a plan for the men and if the men see fit to *continue* the present Employee Representation Plan in effect it is up to the men entirely. * * *

"Stated that the *present* Council Plan has worked out satisfactorily as a bargaining agency so far * * *."

This meeting was adjourned, and a second meeting called ten minutes later in the *same dining room,* and non-council representative-employees participated. Bennett was elected chairman of the meeting. A

general discussion of unions followed, and a committee was appointed to draw up plans. Two meetings followed in the Company dining room and the structure of the Agency was formulated. Bennett sent notices to selected employees in the various departments and a meeting was held May 18, which 64 employees attended, of whom 24 had been members of the Plan Council. The articles of the Agency were approved. The next meeting of the Agency was held in the Company dining room, May 27, 1937. Of the 50 employees present 17 had formerly been on the Council, and they discussed a forthcoming election of representatives. They devised a "donation list" to be circulated to obtain funds. The next meeting was held in the dining room on June 9th. The election was held June 16-18. Approximately 59% of the eligible employees voted.

The minutes of the June 2 meeting of the Plan stated that it was voted to discontinue the Plan, and that the "Plan be discontinued *upon the date which the new Employe Plan* (Agency) *becomes effective.*" The relevant testimony, as summarized in Company's brief, is:

"There was testimony that at this meeting Bennett told Frank L. Wallace, then Assistant General Superintendent * * * that the employees had voted * * * to discontinue the old plan * * * and Wallace 'said that he didn't want to kill the old Plan until the new one was * * * workable.' *As a result of this statement,* the motion which was then before the Plan Council to discontinue the Plan *immediately was amended* so that, as finally passed, it provided for the discontinuance of the Plan at the end of June * * *."

The Agency, too, had a "Council" composed of representatives of the various departments. The Agency wrote the Company asking for recognition as bargaining representative, but the Company merely replied they would *meet* with the Agency. At its first meeting with the Company "three *unfinished* matters which had been the subject of discussion by the Council under the * * * Plan were taken up for discussion." The Board cites the action of the Company on the unfinished matters as indicative that the Agency was, as a bargaining agent, "spineless and ineffective." It appeared that its business consisted of the employees' asking for a special rate on gasoline, and the manager stated that he had written to New York and had received

a reply; that New York "declined to grant this request at this time. Motion made and carried that this item be *closed.*" Representatives on duty at the time of the meeting *received regular pay.*

Donations to the Agency had amounted to $232.25, and expenditures were $217.75. Contribution blanks had been distributed by two employees of supervisory capacity, on Company time.

After July, 1939, the Agency no longer met on Company property, pursuant to advice from the Regional Director.

In addition to some of the above-stated facts, the Board predicated its decision on the following matters:
(as to the Plan)

"General revisions and schedules of minimum rates of pay were invariably prepared and introduced by the respondent and adopted by the Council as presented. Attempts by employee representatives to have the Council consider general raises in pay or the establishment of fixed rates for given jobs met with a refusal by the management representatives to consider adjustments in rates of pay except on an individual basis. * * *

"The Plan was not only instituted and established by the respondent, but continued thereafter to operate only with the respondent's constant financial aid and outspoken support.

"The Plan and the Council continued to function at the respondent's * * * refinery until June, 1937, with the uninterrupted approval, encouragement, and material support of the respondent."
(as to the C. I. O.)

"Late in Feb. of 1937 it was publicly announced that the C. I. O. had decided on a general organizing drive in the oil industry * * * On March 18, 1937, Gen. Supt. Dodge delivered a speech at a Rotary Club luncheon in which he referred to the C. I. O. 'threat' to organize labor in Port Arthur, coupled the C. I. O. with sit-down strikes, and urged the city's merchants and businessmen to 'line up' against any such activities and to discourage any such movement * * *.

"Reed (an employee) testified * * * that he * * * distributed these (C. I. O.) handbills just outside the plant. * * * shortly afterwards he was approached by Moser (asst. to gen. supt.) in the respondent's plant and had an extended conversation with him. Moser indicated to Reed

that the latter's activities in behalf of the C. I. O. were regarded by Moser as a sign of dissatisfaction on Reed's part * * * In response to a question from Reed as to why he did not want the men to join the C. I. O., Moser replied that it was because of the C. I. O. leadership."
(as to the Agency)

"It is admitted * * * that the discussion (at the May 13th meeting) included a request by the Asst. Gen. Supt. Wallace that the old Plan not be 'killed' until the new one was 'workable.' In accordance with his wishes, the effective date of the termination of the Plan * * * was postponed.

"Of the 74 representatives to the Agency Council elected in the 1937 election, approximately 30 were former plan Council * * * members.

"Any representative (of the Agency) leaving 'the service of the Company * *' was automatically to lose his status."

"At the joint conference of April 12, 1939, there was extended discussion of a request for a general increase in rates of pay for all employees * * *. Dodge asked for a statement by the Agency representatives present of the reasons upon which the request for an increase was based. * * * One of the representatives * * * stated that the men in his department * * * felt that the Agency 'is not worth a damn,' and that the C. I. O. was worth more to them than the Agency. In answer, Dodge 'advised that a lot of good had been accomplished by the * * * Agency,' and stated that he 'was sorry to hear such a statement made as he did not feel that this represented the men as a whole * * *.' "

"In response, finally, to a direct demand by Fuller for a definite answer, Dodge rejected the request for a general increase."

"From its inception, the Agency made free and continued use of company facilities in carrying on its activities.

"This conception of continuity was given concrete expression in the duplication of Plan and Agency personnel, in the structural similarity of the Plan Council and the Agency joint conference, and in the uninterrupted assumption by the Agency of the Plan's Council's Activities. The respondent, itself, made no effort to inform its employees of any demarcation or difference between the Plan and the Agency, or of any change in its established policy of dominating and supporting the organization which purported to speak for the employees in their dealings with the respondent."

■ We are not especially impressed by this evidence. However, we are not the fact finding body. As we have been advised, oft and repeatedly, by the Supreme Court, it is not our duty to make findings, but only to accept the findings of the National Labor Relations Board, where there is dispute in the testimony, however contrary said findings may be, in our opinion, to the weight of the evidence.

■ We are in no doubt, in this case, of the existence of substantial evidence to support the Board's finding. In fact, we might add, if the observation counted, that in our opinion, taking the record as a whole, "the whole congeries of fact" rather clearly identify the dominating hand of the employer in the organization and perpetuation of both these unions.

This conclusion is fortified by a study of the decisions wherein a like question was under consideration. Their pertinency is such that we feel justified in setting forth liberal excerpts from them.*

---

* National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 362, 85 L. Ed. —, decided January 6, 1941:
"Most of the company union representatives were active and prominent in Independent's membership drive and during that drive apparently enjoyed somewhat the same privilege of moving freely about the plant which they had been allowed as company union representatives. * * * But, as the Board concluded, it seems impossible to infer that, in view of the extensive and intensive solicitation for Independent in the plant on company time, the supervisory staff were not aware of the campaign and did not acquiesce in it. * * *

" 'Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act.' Congress entrusted the Board, not the courts, with

The determinative question being the sufficiency of the evidence to support the Board's finding, it follows that petitioner's application to set aside the order of the Board must be, and is hereby, denied. The petition of the Board to enforce its order must be, and is, hereby granted.

the power to draw inferences from the facts. * * *

"The Board had the right to believe that the maintenance of the company union down to the date when Independent's membership drive was completed was not a mere coincidence. The circumstantial evidence makes credible the finding that complete freedom of choice on the part of the employees was effectively forestalled by maintenance of the company union by the employer until its abandonment would coincide with the recognition of Independent. * * * the failure of the employer to wipe the slate clean and announce that the employees had a free choice, the belated instructions to the supervisory staff not to interfere—all corroborate the conclusion that the employer facilitated and aided the substitution of the union, which it preferred, for its old company union."

National Labor Relations Board v. Newport News Co., 308 U.S. 241, 60 S. Ct. 203, 208, 84 L.Ed. 219:

"The Board held that, where an organization has existed for ten years and has functioned in the way that the Committee has functioned, with a joint control vested in management and men [such was the case here], the effects of the long practice cannot be eliminated and the employes rendered entirely free to act upon their own initiative without the complete disestablishment of the plan. * * *

"In applying the statutory test of independence it is immaterial that the plan had in fact not engendered, or indeed had obviated, serious labor disputes in the past, or that any company interference in the administration of the plan had been incidental rather than fundamental and with good motives."

Westinghouse Co. v. Labor Board, 2 Cir., 112 F.2d 657, 660, affirmed per curiam, on authority of the above two citations, March 10, 1941, 61 S.Ct. 736, 85 L.Ed. —:

"It is true that in that case there was somewhat less separation between the old and the new than in the case at bar; the union was in form merely a 'revision' of the earlier 'Plan', and its constitution had been prepared in part at any rate, by executives of the company. But that was not the circumstance which counted * * * it was rather that the employees at large had not been advised that the company was wholly indifferent whether they joined the new union, and that, as it might, and probably did, appear to be a successor of the old, the separation should have been made plain, and with it the discontinuance of any continued countenance from the employer. The theory is that in cases such as this, where an unaffiliated union seems to the employees at large to have evolved out of an earlier joint organization of employer and employees, the Board may take it as datum, in the absence of satisfactory evidence to the contrary, that the employees will suppose that the company approves the new, as it did the old, and that their choice is for that reason not as free as the statute demands. How substantial such a fear really is, it is not for us to say; upon how much evidence the Board may insist to make public the change, the court did not declare; nor need we here; for the company did not make any effort to make it plain to the employees generally that the 'Independent' was not a revision, or amendment, of the 'Plan'. On the surface it seemed to be such, for it emanated from the old elected representatives, and that alone established an appearance of continuity between the two. *Madden's speech on May 12th was only to those representatives; the company did not seek to broadcast it or its equivalent in any way to the employees*—about 2,500 in all. So far as appears, it was content to let them assume, what was true, that the 'Independent' had arisen out of the 'Plan'; and to believe, as they quite naturally might have done, that it preferred the successor to the C. I. O."