**KEYSTONE STEEL & WIRE CO. et al. v.
NATIONAL LABOR RELATIONS
BOARD et al.**

No. 8887.

Circuit Court of Appeals, Seventh Circuit.

April 2, 1946.

Rehearing Denied June 27, 1946.

554

KERNER, Circuit Judge, dissenting.

———◆———

Theodore C. Baer, Arleigh Davis, Harry E. Witherell, Shelton F. McGrath, and Edwin .V. Champion, all of Peoria, Ill., for petitioner.

Alvin J. Rockwell and Malcolm F. Halliday, N. L. R. B., both of Washington, D. C., Jack Evans, Asst. Gen. Counsel, N. L. R. B., of Chicago, Ill., David A. Morse, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Dominick L. Manoli and Emily Cronheim, Attys., N. L. R. B., all of Washington, D. C., for respondent.

Before EVANS, SPARKS and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

By this petition plaintiffs seek to review and, in part, set aside an order of the National Labor Relations Board of June 22, 1945. The Board petitions for its enforcement. The parties will be referred to as Keystone, Alliance, the Board, and the C. I. O. Union.

The complaint which resulted in the order was filed on April 8, 1944. It was based upon charges filed by the C. I. O. Union on February 15, 1943, that Keystone was guilty of unfair labor practices under Section 8(1) and (2) of the National Labor Relations Act, 29 U.S.C.A. § 158(1–3), referred to as the Act, in that it had dominated and interfered with the formation and administration of Alliance, an independent Union, all of whose members were in the employment of Keystone. On July 13, 1943, the charges were amended by also alleging Keystone's violation of Section 8 (3) of the Act, by discharging seven of its employees because they were members of the C. I. O. Union. On July 14, 1943, the charges were again amended by adding the name of another employee, who, as alleged, was discharged because of his membership in the C. I. O. Union, in violation of Section 8(3) of the Act. On April 8, 1944, the charges were again amended by further alleging that in September 1933, Keystone formed, instigated and thereafter supported, financed and interfered with the administration of the Keystone Employees Association, an independent labor organization, referred to as K. E. A.; that in 1937, Keystone instigated and formed the Independent Steel Workers' Alliance as successor to K. E. A., and since that date has dominated and interfered with the administration of Alliance, and illegally recognized and dealt with it as the exclusive bargaining agency of all Keystone employees, and encouraged membership in it; and that on or about June, 1942, and thereafter, Keystone interfered with, restrained and coerced its employees in the exercise of their rights to join and assist the C. I. O. Union.

On April 12, 1944, Alliance, by permission of the Board, intervened and filed its answer to the complaint. On June 7, 1944, the charges were again amended by further alleging that in December 1940, Keystone violated Section 7 of the Act by promulgating a rule prohibiting all forms of solicitation for labor organizations upon the Keystone's property, which rule was used by Keystone to protect Alliance and to impede the C. I. O. Union in its organization campaign.

The complaint was amended to consist with the charges and its amendments, and petitioners denied the material allegations of the complaint. At the conclusion of the Board's evidence, Keystone and Alliance each moved to dismiss the complaint, which motions were denied. At the conclusion of all the evidence, like motions were made by the same parties and denied. The Board filed its intermediate report in which it

made special findings of facts, and in substance recommended that Keystone should:

1. Cease and desist from:

(a) Contributing support to, or dominating or interfering with the formation or administration of Alliance, or any other labor organization of its employees.

(b) Giving effect to any and all contracts with Alliance.

(c) In any other manner interfering with any of its employees in the exercise of their rights to self organization, to form labor organizations, to join or assist the C. I. O. Union, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in section 7 of the Act, 29 U.S.C.A. § 157.

2. (a) Withdraw all recognition from Alliance, as representative of any of its employees for the purpose of dealing with Keystone concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and completely disestablish Alliance as such representative.

(b) Rescind immediately the rule against solicitation on employees' own time.

(c) and (d) Give the usual notices required by the Act.

The Board further recommended that the complaint be dismissed as to the eight employees alleged to have been discharged by Keystone because they were members of the C. I. O. Union.

The recommendations follow the findings rather closely. However, the legal questions presented to us, for the most part, are whether certain findings are supported by substantial evidence.

The dominant question before us is whether there is substantial evidence to support the Board's finding that Keystone dominated and interfered with the formation and administration of Alliance. Under respondent's theory, an answer to this question involves historical facts relating to K. E. A., which was organized in September, 1933. From about that date until the early part of April, 1937, K. E. A. was the bargaining agent of its members with Keystone.

The Act here involved, which provided for bargaining agents, became effective July 5, 1935, and was first declared constitutional by our Supreme Court, April 12, 1937. National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

The Board found that in the fall of 1933, W. C. Buchanan, then an officer of Keystone, who has not been connected with this management since April 1935, urged its employees to form a union of their own, because they could get along with the company better than if they had an outside organization in the plant. At that time no other labor union had sought or was seeking applications for membership in any labor union. Thereupon the employees organized K. E. A. Their plan of organization was submitted to and approved by Keystone, and a membership campaign was conducted in the plant during working hours. Certain joint committees were appointed on which were representatives of both labor and company management, the latter appointing its own members thereon. K. E. A. required no dues or initiation fees, and it functioned through departmental representatives elected by the employees of the various departments, who in turn selected their own officers and arranged their own procedure, among other things, for collective bargaining. Keystone contributed financial support to and furnished a meeting place and office equipment for K. E. A., and outfitted a baseball team and furnished materials for a ball field and grandstand on Keystone's property. For a year or two the team charged admission to its home games and had confectionery concessions at the ball park, and K. E. A. was permitted to raise funds during working hours by selling tickets for dances and other events. From these sources K. E. A. had in its treasury in April, 1937, the sum of $228.53, in which Keystone had no interest or control.

None of these activities were unlawful prior to July 5, 1935, when the National Labor Relations Act became effective. However, subsequent acts of that nature were unlawful and prohibited by that Act. Prior to the Act, Keystone was under entirely different management and was represented by different counsel. The Board found that within a few days after the Supreme Court had upheld the Act on April 12, 1937, Mr. Sommer, Keystone's vice-president and general manager, had a meeting with the officers of K. E. A. and informed them that the Company would no longer bargain with or recognize K. E. A.

as the bargaining agent of its employees because, as it existed, it violated the Act. (This finding was based on oral testimony as to the date occurring eight years before, notwithstanding there was in evidence the 48th Annual Report of Keystone for the fiscal year ending June 30, 1937, including a letter from its president to its stockholders in which it was stated: "In March 1937 * * * K. E. A. was disbanded and employees organized their own independent union, The Independent Steel Workers Alliance.") At this meeting no one discussed or suggested a new labor organization. Within a few days after this meeting the officers of K. E. A. reported at a meeting of its General Committee the result of their meeting with Mr. Sommer. At this meeting the General Committee, which was the governing committee of K. E. A., with representatives from each department in the plant, voted to dissolve K. E. A., and its former officers were instructed then and there to notify the company of such dissolution. At this meeting there was some discussion of a new organization but no action was taken. When this meeting adjourned no one present was charged with any duty or was selected to do anything on behalf of any new organization of employees. This record does not disclose any action by any former committee or officer of K. E. A., subsequent to such dissolution meeting. On the following day Mr. Sommer was told of such dissolution at which time some cabinets and equipment, owned by the company and used by K. E. A., were turned back to the company together with the key to a small room used by K. E. A. as an office. The record discloses that the representative of each department on the General Committee was requested to notify each member of K. E. A. in his department of such dissolution and the reason therefor, and these facts were openly discussed among the employees throughout the plant in the various departments.

About two weeks after this dissolution meeting there was a meeting of the company employes held at Heitzman Hall, in Bartonville, to discuss the question of an organization of employees. This hall was not owned or controlled by Keystone. In the interim there was no organization of employees of the company, and grievances were arising among the employees. At this meeting, plans were made for another meeting in a few days, and word to that effect was passed around among the employees

in each department. This second meeting was held on April 16, 1937, at Heitzman Hall, and it was there decided by the attending employees to have an independent employees organization; a committee was appointed to prepare a constitution and by-laws; and the meeting adjourned until April 21, 1937. At that meeting minutes were kept, and a constitution and a portion of the by-laws, as prepared by the committee, were read and approved under the name, Independent Steel Workers Alliance, and they were in no respect in conflict with the Act. Applications for membership were read and approved; temporary officers were authorized to rent a hall, to purchase furniture and to install a telephone. On April 27, 1937, the new organization met and completed the details of its organization. No representative of the company was ever present at any of these organization meetings of Alliance.

On April 22, 1937, Alliance wrote a letter to the company stating that it had as its members a majority of the employees of the company; asked for a meeting with the management on April 28, 1937; and demanded recognition as the sole bargaining agent for Keystone's employees. Representatives of the Alliance met with the management on the last-named date and demanded and received recognition as the exclusive bargaining agency. At that time the representatives had with them and submitted to Keystone, 970 signed application cards of members of the Alliance out of a total of 1400 employees who were then eligible to membership in Alliance. Since that time and continuously to the present, Alliance has acted as bargaining agent for Keystone. Up to that time there was no competing labor organization at Keystone, and there never was until C. I. O. appeared in June, 1942, more than five years thereafter.

On May 17, 1937, a general election was held by Alliance, at which meeting permanent officers and departmental committeemen were elected in an open competitive election participated in by approximately 750 members of Alliance. There were three candidates for president, four for vice-president, and three for secretary-treasurer. All received a substantial vote. There were in excess of three candidates for departmental committeemen in each department. As a result, most of the officers and some of the committeemen elected were former officers and committeemen of

K. E. A., yet they were all elected in an open and competitive election. Annual elections have been held since that time at which officers and departmental committeemen have been elected by the membership of Alliance.

Up to 1942, the Company and Alliance held numerous bargaining conferences and reached agreement as to terms and conditions of employment. Although Alliance had repeatedly requested that these agreements be incorporated in a signed written contract, Keystone declined to accede to this request for the stated reason that no other "little steel" company had signed such contracts with a labor organization. However, in December, 1940, Keystone issued a written "Statement of Labor Relations Policy" covering matters usually embodied in a collective bargaining agreement, including recognition of Alliance as the exclusive bargaining agent of its employees. It is fair to say, however, that the Act did not specifically state that such bargaining agreements should be in writing. Courts at that time were not in agreement as to whether they should be, and it was not until January 6, 1941, that the Supreme Court construed the Act to mean, by implication, that such contracts should be in writing. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed 309. Upon renewal of the contract it was in writing and signed by the parties, and it has been ever since.

Upon these facts the Board found that, "the Alliance exists as a continuation of, and the successor to, the K. E. A. and thereby inherited the K. E. A.'s taint of illegality. It is clear that the Alliance grew out of the K. E. A. without any line of fracture or break in continuity." Of course in point of time and position, Alliance did succeed K. E. A. However, neither Congress nor our courts have ever subscribed to the doctrine that any American citizen can inherit a "taint of illegality." In legal parlance, wherever there is an inheritance there has been a death, and there may be deaths without inheritance, and there may be inheritances which are not accepted. Petitioners concede the death of Alliance by disestablishment, but they deny that there was any inheritance or anything to inherit. Whatever Alliance may have appropriated from the constitution, by-laws and practices of K. E. A., they are not in any manner violative of the Act. True, Alliance received the baseball fund amount-

ing to $228, but this was done at the request of the ball players.

Petitioners concede that certain findings concerning the formation and administration of K. E. A. are supported by substantial evidence. For instance, the Board found that Keystone's official suggested its formation; K. E. A. conducted a membership campaign in the plant during working hours; the plan of organization was submitted to Keystone and approved by it; it served on certain joint committees with labor representatives; it contributed financial support to K. E. A., by furnishing its meeting place and equipment; and outfitted a ball team and its place to play. Petitioners also concede that these facts made K. E. A. an illegal labor organization for collective bargaining purposes, and the uncontradicted evidence discloses that this fact was the sole motive for its dissolution. The sole motive for the organization of Alliance was the absence of an employees organization and the obvious need for one.

It is not here directly contended by respondents that the former members of K. E. A., after its demise, could not in some manner thereafter form a labor union qualified to serve as bargaining agent in compliance with the requirements of the new Act, notwithstanding the past deeds of its predecessor. However, their contention here is based substantially on the past deeds of K. E. A. Certainly, the Act does not preclude even the old organization, if still existent, from serving as bargaining agent, if selected and if, in good faith it has substantially complied with the Act. If this be not true it would be most difficult, if not impossible, for any such organization to qualify under the Act. We are convinced that the statute requires us to protect the rights of the independent Union, as well as of those nationally organized. See National Labor Relations Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796. We think it cannot be said, under this evidence, that Alliance is the successor of K. E. A. in any material and substantial respect. We are unable to conceive what more the members of Alliance could have done to bring it within the Act, and their conduct since its organization has been both laudable and legal, with perhaps one minor exception, with relation to a rule, which we shall later discuss.

Similarity of constitutions is urged as proof that Alliance is the alter ego of

K. E. A. We suppose all written constitutions have some points of similarity, but, where, as here, the offending features of the K. E. A. constitution are not present in that of Alliance, they can not be said to be materially similar.

Aside from the alleged heirship of Alliance to K. E. A. and the alleged but not proved similarity of their constitutions, the Board found that the formation of Alliance almost immediately followed the dissolution of K. E. A. That this is not evidence of heirship, nor is the fact that some officers of the old union were re-elected by the members of the new, is supported by Foote Bros. Gear & Machine Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611.

The Board further found that at the same time the members of K. E. A. decided to abandon it, they also decided to establish Alliance, another unaffiliated union. This, of course, is a violation of no statute. E. I. du Pont de Nemours & Co. v. N. L. R. B., 4 Cir., 116 F.2d 388, certiorari denied 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529; De Bardeleben v. N. L. R. B., 5 Cir, 135 F. 2d 13. Nor does it tend to prove that the members of Alliance would continue to operate under the old constitution of K. E. A. rather than its own, which contained none of the objectionable features of the former.

It is contended by respondents that Keystone did not notify each of its employees that K. E. A. was disestablished. The evidence discloses that this fact was reported to K. E. A.'s General Committee, which was its governing committee, at which meeting representatives of each department were present, and were there requested respectively to notify each member of K. E. A. in their departments of such disestablishment, and it was openly discussed by the employees throughout the plant. The president of the C.I.O. Local Union testified that such disestablishment was generally known among all the employees within thirty to forty-five days after it occurred, and that it was a matter of general conversation at the time the whole thing was done. Confirmatory of such notice, application cards for membership in Alliance were signed and delivered to Keystone by 970 out of approximately 1400 employees of Keystone.

We think such notice was sufficient under the statute. Foote Bros. Gear & Machine

Corp. v. N. L. R. B., 7 Cir., 114 F.2d 611; N. L. R. B. v. Duncan Foundry & Machine Works, Inc., 7 Cir., 142 F.2d 594; E. I. du Pont de Nemours & Co. v. N. L. R. B., supra.

We find in this record no evidence whatever to support the Board's charges that Keystone suggested, encouraged or in any manner assisted in the organization or maintenance of Alliance; or that it dominated, aided, or in any manner interfered with its administration; or that it urged or warned any of its employees to join or assist Alliance. Furthermore there is a complete absence of evidence to support the charge that Keystone urged, threatened, warned or coerced any of its employees to refrain from joining or remaining members of the C. I. O. Union; and as to the charge that Keystone had demoted and discharged eight employees for being members of C. I. O. Union, the Board found this to be untrue.

It is undisputed that all employees, regardless of union membership, were treated precisely the same with respect to employment, preferment and seniority rights.

The fact that the former officers of K.E.A. took the leading part in the formation of Alliance and eventually became its officers is of no importance in determining the question of domination. E. I. du Pont de Nemours & Co. v. N. L. R. B., supra; Foote Bros. Gear & Machine Corp. v. N. L. R. B., supra.

The further fact that Alliance was quickly formed and promptly recognized by Keystone is not an unfair labor practice, and if Alliance represented a majority of the employees, as it did, it was the duty of Keystone to recognize it.

The Board's findings and order stress certain acts alleged by it to have been discriminatory on the part of Keystone to Alliance and adverse to the C. I. O. Union. The first instance is that the general superintendent of Keystone stated that he expected to procure the names of certain employees who had attended a meeting of the C. I. O. Union. The evidence does not disclose that he ever procured those names or if he did that he ever did anything about it. This court has decided that mere curiosity is not an unfair labor practice. Foote Bros. Gear & Machine Corp. v. N. L. R. B., supra. The next instance is that subsequently the man to whom the superintendent made such a remark was found to be a

member of the C. I. O. Union. Thereupon Alliance, without suggestion or assistance from the management, expelled him from Alliance. This was a proper procedure and no discrimination was made by the company against him, nor was his job in any way affected thereby, since Keystone was not a closed shop.

■ The respondents lay considerable stress upon what is termed the "no-solicitation rule" promulgated by Keystone in 1940. This rule permitted no form of solicitation on Keystone's premises. It is agreed that under the more recent decisions, this rule was invalid in so far as it prevented union solicitation during non-working hours. The rule applied to all employees regardless of their membership. The evidence discloses about six instances where letters were written by Keystone reprimanding particular employees for their solicitation activities during working hours. No action was taken by the company unless complaint was made. The only complaint made by any C. I. O. member concerning solicitation by Alliance was made by witnesses Hout, White and Huber concerning solicitation during working hours by a Mr. Hogue who was president of Alliance. He was reprimanded by the superintendent, and told to cease such activities. The evidence further discloses that the superintendent never failed or refused to reprimand any employee regardless of his union affiliations when complaint was made to him about such activities. Foreman Cordes testified that he never received any such complaint from the employees belonging to C. I. O., but that he had a lot of conversation with men regarding solicitation and told each of them that it was contrary to the rules and not permissible. The record discloses that the rule was enforced only upon complaint, against everyone regardless of his union membership. Furthermore, the president of the local C. I. O. admitted soliciting for C. I. O. on company property during working hours, and he further testified that Keystone had never discriminated against him.

Another such instance was when Alliance had placed in the shop a ballot box for the purpose of voting on some questions of working conditions during working hours. A foreman thereupon told an Alliance member in charge that he must remove the box and not take any vote during working hours. A superintendent testified that he had been criticized by both sides for enforcing the no-solicitation rule. It is worthy of note that of all instances here stressed wherein an employee was reprimanded for violation of this rule, each was for solicitation during working hours.

Another instance was, as found by the Board, that employee Kelly was actually discharged for the alleged violation of the no-solicitation rule. The record does not support this finding. Kelly was discharged for manhandling an employee and was laid off on December 24, but returned to his work on December 26, after the foreman, who heard the evidence, decided that it was not sufficient to justify a discharge. Kelly was promoted by Keystone on January 1, and his seniority rights were in no way affected. He worked for the company another year and had another advancement.

■ Several isolated instances of alleged anti-union remarks by some of the supervisory employees of Keystone, who had no power to either "hire or fire," are emphasized in the findings as constituting an anti-union policy on the part of Keystone. It is apparent that most of them were not used in an anti-union sense, and if they were, they are not sufficient, as a matter of law, to constitute a substantial evidentiary basis which would support a finding that such a policy existed on the part of Keystone. E. I. du Pont de Nemours and Co. v. N. L. R. B., supra; Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. Mathieson Alkali Works, Inc., 4 Cir., 114 F.2d 796.

Furthermore, at the hearing, 218 employees of Keystone testified: (1) That Keystone never did anything or failed to do anything to influence them to join or not to join any union; (2) that they had always felt and still felt free to join or not to join any union they saw fit without fear that Keystone would in any way discriminate against them; (3) and that Keystone never at any time dominated or interfered with the affairs of Alliance. They offered to testify that Alliance was the bargaining agent of their choice, which offer was refused by the examiner. Keystone also offered to produce 919 additional employees, constituting the balance of the membership of Alliance, to testify to the same effect, which offer was refused by the examiner, because such evidence was cumulative. However, he stated that he would assume

560

that the additional witnesses would testify to the same effect as those actually heard, whereupon a formal offer of proof of such testimony of the 919 additional employees was made, and a list of the names of such witnesses was tendered, and the offer was refused.

The Board's order recites that the Board considered all of this evidence, and the following quotation from its decision and order discloses the manner in which they considered it:

" * * * We have considered this evidence and find that it does not overcome the more positive testimony in the record that the Alliance is the successor to the K. E. A., that the respondent rendered unlawful support and assistance to the Alliance, and that the respondent's conduct with respect to both organizations removed from the employees' selection of the Alliance the complete freedom of choice which the Act contemplates. Moreover, such testimony by employees concerning the effect, or lack of effect, of the respondent's acts on them, aside from being generally unreliable because of the very nature of the circumstances involved, is not probative of whether the respondent has actually engaged in the illegal conduct found above and upon which our unfair labor practice findings herein are predicated. * * * "

From this order it is clear that the Board predicated its finding largely, if not exclusively, upon the past conduct of K. E. A. True, it is also recited therein that it relied upon the fact that Keystone rendered unlawful support and assistance to Alliance, but this record discloses nothing in the way of support and assistance that Keystone ever gave to Alliance. Keystone's alleged conduct with respect to both organizations formed the basis of the order. The order further states:

" * * * That the Alliance may have achieved some measure of success during its protracted bargaining relationship with the respondent cannot, and does not, cleanse the Alliance of its *illegal taint*. Moreover, it cannot be said that greater benefits might not have been secured if the freedom of choice of a bargaining agent had not been interfered with. In any event, the effect of the respondent's unlawful conduct with respect to the Alliance and its predecessor, the K. E. A., have not been dissipated. Upon the entire record, we are convinced and find that the Alliance is in-

capable of functioning as a true bargaining representative of the respondent's employees and continues to operate as a bar to the freedom of self-organization." (Our italics.)

From this it seems clear to us that the only manner in which the Board considered the testimony of 1137 witnesses out of the 1371 employees was, as the Board stated, as "generally unreliable" testimony.

Whether, as suggested by the findings, greater benefits might have been secured to the members of Alliance, had they chosen C. I. O. as their bargaining agent, is a matter with which courts can not be concerned. That is to be determined solely by the membership, and if the agent so selected is legally qualified and willing to serve, the courts are bound to approve the selection.

Alliance has at all times paid its own expenses, has paid Keystone the cost of deducting union dues from pay checks, has rented its own hall and held meetings away from Keystone's premises, and has dropped from its membership every person who became a supervisor. It has secured a profit-sharing plan with Keystone, liberal vacations, and a wage scale 16¢ an hour higher than the average scale in the steel plants of this country prior to 1946. During the period from 1937 to 1942, its representation was eminently satisfactory to the employees, and about eighty per cent of them maintained their membership therein.

We are convinced that the findings are not supported by substantial evidence except wherein the Board finds that Keystone is not guilty of illegally discharging the eight members of the C. I. O. Union. The order is therefore vacated, except as it relates to the alleged discriminatory discharge of eight employees, under Sec. 8 (3) of the Act, and the Board's request for enforcement is denied.

KERNER, Circuit Judge (dissenting).

The question is whether the Board was justified in its conclusions that Keystone's conduct toward the Keystone Employees Association and its successor, the Alliance, amounted to interference with Keystone's employees in the exercise of their rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, and that Keystone interfered with the formation of United Farm Equipment & Metal Workers of America.

The law is now well established that it is for the Board to determine the credibility of witnesses, the weight of the evidence and the inferences to be drawn therefrom, and, from all the evidence, to decide whether Keystone engaged in unfair labor practices within the meaning of § 8(1) and (2) of the Act, 29 U.S.C.A. § 158(1), (2).

With these principles in mind, I have studied the record and am satisfied that the findings of the Board are sustained by substantial evidence. I see no necessity for any extensive discussion of the evidence, since the evidence upon which the Board relied is set forth in its decision and order, 62 N.L.R.B. 683. From this evidence, the circumstances and inferences reasonably flowing therefrom, and more that might be set forth—taken as a whole, it is clear that the Board reasonably could have found that Keystone in violation of § 8(2) of the Act dominated and interfered with the administration of, and contributed support to, the Keystone Employees Association and dominated and interfered with the formation and administration of, and contributed support to, its successor, the Alliance, and by the extension of a rule prohibiting union solicitation during the employees' non-working time at the plant, interfered with, restrained and coerced its employees in the exercise of the rights guaranteed them in § 7 of the Act, in violation of § 8(1) of the Act. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 59, 63 S.Ct. 905, 87 L.Ed. 1250; National Labor Relations Board v. Rath Packing Co., 8 Cir., 115 F. 2d 217, 219; Western Electric Co., Inc., v. National Labor Relations Board, 4 Cir., 147 F.2d 519, 524; Texas Co. v. National Labor Relations Board, 7 Cir., 119 F.2d 23; National Labor Relations Board v. Duncan Foundry & Machine Works, Inc., 7 Cir., 142 F.2d 594, 596; National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984, 986; National Labor Relations Board v. General Motors Corp., 7 Cir., 116 F.2d 306; Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 134 F.2d 240, 244; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; National Labor Relations Board v. Rath

Packing Co., 8 Cir., 123 F.2d 684; National Labor Relations Board v. Eclipse Moulded Products Co., 7 Cir., 126 F.2d 576, 580; and Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 157 A.L.R. 1081.

Consequently, I would enforce the order of the Board.